**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**J6ERS WERE TORTURED IN THE DC GULAG,**
an unincorporated association
c/o LAW OFFICE OF JONATHAN GROSS
2833 Smith Ave., Suite 331
Baltimore MD 21209
*Petitioner,*

v.

HARMEET K. DHILLON, in her official capacity as
Assistant Attorney General for the Civil Rights
Division, U.S. Department of Justice,
950 Pennsylvania Ave. NW
Washington DC 20530
*Respondent.*

Case No. 1:26-cv-3013

**PETITION FOR WRIT OF MANDAMUS**

**INTRODUCTION**

1. On October 13, 2021, United States District Judge Royce C. Lamberth adjudged the Warden of the D.C. Jail and the Director of the D.C. Department of Corrections in civil contempt of court, and ordered the Clerk of the Court to transmit that order to the Attorney General of the United States "for appropriate inquiry into potential civil rights violations of January 6 defendants." That order has never been honored. No such investigation has ever been opened. Nearly four years later, Respondent Harmeet K. Dhillon, as the Assistant Attorney General presiding over the very division to which Judge Lamberth's referral was directed, continues to sit on a federal court order that has gone unexecuted through two Administrations.

2. Petitioner, an unincorporated association of the January 6 defendants who were detained without trial at the D.C. Jail between January 2021 and January 2025, brings this Petition for a Writ of Mandamus compelling Respondent to discharge the non-discretionary duty created by Judge Lamberth's order: to open a civil rights investigation into the D.C. Department of

Corrections ("DOC"), its director, and its warden, for the violation of the civil rights of January 6 pretrial detainees at the Central Detention Facility ("CDF") and Central Treatment Facility ("CTF"), collectively known as the "D.C. Jail."

3. As detailed below, the record compiled since 2021 — a U.S. Marshals Service inspection, a bipartisan Senate Judiciary Committee letter, a D.C. Council emergency roundtable, a Department of Justice press release documenting a corrections officer's arrest for smuggling weapons and drugs to inmates, and a 2024 independent audit finding a death roughly once a month — has only confirmed and compounded the systemic failures Judge Lamberth identified. Still, no civil rights investigation into the treatment of January 6 detainees has ever been opened.

4. The D.C. Jail remains open and operating a few miles from the Civil Rights Division's own headquarters. This Petition is filed on an urgent basis because the duty to investigate is clear, non-discretionary, and long overdue, and because the conditions the referral was meant to address are, on this record, a continuing matter of life and death.

5. October 13, 2021, Judge Royce C. Lamberth, United States District Judge for the District of Columbia, issued the following Order:

> For the reasons stated in open court, it is ADJUDGED that the Warden of the D.C. Jail Wanda Patten and Director of the D.C. Department of Corrections Quincy Booth are in civil contempt of court. The Clerk of the Court is ORDERED to transmit a copy of this order to the Attorney General of the United States for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case. Assistant United States Attorney William K. Dreher can provide appropriate records from this case.
> **IT IS SO ORDERED.**

6. The referral was never limited to the individual defendant in that case. By its plain terms, it directed an inquiry into "potential civil rights violations of January 6 defendants" as a class — "as exemplified in this case." No investigation responsive to that referral has ever been opened.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1361, which vests the district courts with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the petitioner.

8. Venue is proper under 28 U.S.C. § 1391(e) because Respondent performs her official duties in the District of Columbia, the events giving rise to the referral occurred in the District of Columbia, and the underlying order was entered by this Court.

## PARTIES

9. Petitioner, J6ers Were Tortured in the DC Gulag, is an unincorporated association comprised of individuals charged in connection with the events of January 6, 2021, who were held as pretrial detainees at the D.C. Jail at any time between January 2021 and January 2025. Petitioner's members have a direct and personal interest in the opening of a civil rights investigation into the conditions to which they were subjected.

10. Respondent Harmeet K. Dhillon is the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, the division to which Judge Lamberth's October 13, 2021 referral was directed and which holds sole authority to open the investigation the Order requires. She is sued in her official capacity only.

## STATEMENT OF FACTS

11. Following January 6, 2021, defendants charged in connection with events at the Capitol were arrested throughout the country. Many were initially released on conditions, or on unsecured bond, by magistrate judges in their home districts under the ordinary operation of the Bail Reform Act. On appeal to this Court, however, a substantial number of those release decisions were reversed, and a practice developed of detaining January 6 defendants pretrial and transporting

them to the District of Columbia to be held at the D.C. Jail pending trial — a practice premised, in many cases, on the characterization of the defendants as a unique danger to democracy itself, rather than on the individualized findings ordinarily required under the Bail Reform Act.

12. As a result, January 6 pretrial detainees who had committed no prior crime and who, under ordinary pretrial risk classifications, would have presented among the lowest security profiles in the federal system, were consolidated at a single local jail far from their homes, families, and attorneys.

13. Beginning in mid-2021, news organizations reported allegations of inhumane treatment of January 6 pretrial detainees at the D.C. Jail, including extended lockdowns, prolonged isolation in solitary confinement, denial of medical care, denial of religious services, and interference with access to counsel.

14. Representative Marjorie Taylor Greene, after being denied entry to the facility on multiple prior occasions, ultimately toured the D.C. Jail on November 4, 2021, and published a first-hand eyewitness account, "Unusually Cruel: An Eyewitness Report from Inside the DC Jail." That report documented, among other things, cells bearing residue of human waste, blood, and mold in the wing housing January 6 detainees; detainees denied access to attorneys, family contact, adequate nutrition, and religious services; and retaliation against detainees who spoke out about conditions.

15. On October 18, 2021, the Acting United States Marshal for the District of Columbia directed an unannounced, eight-deputy inspection. The inspection team interviewed more than 300 detainees over four days, and the Acting Marshal personally visited the facility to verify the team's preliminary findings.

16. In a memorandum dated November 1, 2021, addressed to D.C. DOC Director Quincy Booth and copied to, among others, the Chief Judge of this Court, the Deputy Chief of the DOJ Civil Rights Division, and the D.C. Federal Public Defender, the Acting Marshal reported that he believed there was "evidence of systemic failures, in particular at the Central Detention Facility (CDF), that may warrant further examination by the Department of Justice Civil Rights Division." The memorandum listed the following findings:

- Water and food appeared to be withheld from detainees for punitive reasons.
- Inspectors observed large amounts of standing human sewage (urine and feces) in the toilets of multiple occupied cells. The smell of urine and feces was overpowering in many locations.
- The water in many of the cells within South 1 and North 1 had been shut off for days, inhibiting detainees from drinking water, washing hands, or flushing toilets.
- DOC staff confirmed to inspectors that water to cells is routinely shut off for punitive reasons.
- Food delivery and storage is inconsistent with industry standards. Hot meals were observed served cold and congealed.
- Jail entrance screening procedures were inconsistent and sloppy.
- Evidence of drug use was pervasive, and marijuana smoke and odor were widespread, and the facility had a strong smoke and odor of marijuana.
- Detainees had observable injuries with no corresponding medical or incident reports available to inspectors.
- DOC staff were observed antagonizing detainees.
- DOC staff were observed not following COVID-19 mitigation protocols.
- Several DOC staff were observed directing detainees to not cooperate with USMS inspectors. One DOC staffer was observed telling a detainee to "stop snitching."
- Supervisors appeared unaware or uninterested in any of these issues.

17. The Acting Marshal expressly forwarded these findings to the DOJ Civil Rights Division "for review of potential violations of the Civil Rights of Institutionalized Persons Act."

18. On November 10, 2021, the D.C. Council's Committee on the Judiciary and Public Safety convened a public oversight roundtable, chaired by Councilmember Charles Allen. Allen stated, "The situation is a crisis… The District of Columbia has a moral and constitutional duty to provide dignified and human conditions of confinement and to do so immediately, and that's not happening here." Witnesses, including former employees and inmates, reported pervasive staff misconduct, medical neglect, and unsanitary conditions, corroborating USMS findings. Council members and witnesses stated that these conditions had been known for years, yet no corrective action, and no civil rights investigation of the treatment of January 6 detainees specifically, was undertaken.

19. On October 13, 2021, arising from the same conditions documented above, Judge Lamberth held Warden Wanda Patten and Director Quincy Booth in civil contempt of court in *United States v. Worrell*, and ordered the Clerk to transmit the order to the Attorney General "for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case."

20. Notwithstanding Judge Lamberth's referral, the Department of Justice under the Biden Administration did not open the required investigation. Instead, the Department continued, as a matter of practice, to seek and obtain the pretrial detention of January 6 defendants at the D.C. Jail, all the way through January 2025 — more than three years after the referral issued.

21. Judge Lamberth's finding was not an isolated one. Two months later, in December 2021, United States District Judge Thomas F. Hogan, presiding over *United States v. Nichols*, No. 1:21-cr-117, learned at a hearing on an undisputed record that January 6 pretrial detainees were

being confined to their cells for 22 to 23 hours a day. Judge Hogan further acknowledged that this treatment was not limited to the defendant before him. On the record, Judge Hogan stated: "and so I accept your argument that ***his due process rights were violated*** and that should be another basis for his release." (emphasis added). Thus, within the span of two months, two different judges of this Court had independently found, on the record, that January 6 pretrial detainees were being subjected to conditions of confinement so severe as to violate their civil rights.

22. Notwithstanding these back-to-back judicial findings, the Department of Justice continued to detain January 6 defendants brought from across the country at the D.C. Jail for another three years, until January 2025, when President Trump liberated them by ordering their release.

23. On February 24, 2022, the U.S. Attorney's Office for the District of Columbia publicly announced the arrest of a D.C. Department of Corrections officer assigned to CDF on federal bribery and contraband charges, alleging that the officer accepted money in exchange for smuggling knives, drugs, and cell phones to inmates for distribution within the jail. The press release thus confirmed, in the government's own words and in a public criminal filing, that CDF staff were engaged in bribery and the smuggling of weapons and narcotics to the inmate population. Even with public confirmation of criminal corruption inside the facility, no civil rights investigation into the treatment of January 6 detainees was opened.

24. On May 6, 2022, the Chair and Ranking Member of the Senate Judiciary Committee, Senators Richard J. Durbin and Charles E. Grassley, joined by Senator Benjamin L. Cardin, wrote to Attorney General Merrick Garland regarding the USMS inspection. The Senators stated that "no person should be held under the unconscionable conditions that USMS found at CDF, less than two miles from the United States Capitol," and that while they appreciated the

corrective steps USMS had taken, they were "concerned by its failure to uncover these deplorable conditions sooner—and that it took recent complaints by January 6 pretrial detainees to address conditions that have long been a matter of public record." A bipartisan committee of the United States Senate confirmed in writing that no meaningful inspection of these conditions had occurred until January 6 detainees themselves forced the issue. Still, no civil rights investigation into the treatment of January 6 detainees followed.

25. Documents obtained from the D.C. Jail show that January 6 detainees, notwithstanding the absence of any prior criminal history and a risk profile that under ordinary classification criteria should have placed them among the lowest and safest custody levels, had their internal classification scores adjusted upward based on nothing more than their status as January 6 defendants. As a result, detainees who posed no demonstrated security risk were classified and housed alongside the facility's most dangerous and violent offenders, subjected to the corresponding restrictive-housing conditions on that basis alone. This is direct documentary evidence that January 6 detainees were treated differently than the rest of the jail population.

26. A 2024 audit by the Council for Court Excellence and D.C. Auditor, covering July 2023 to June 2024, reported 17 deaths in D.C. Jail facilities, Seventeen deaths across a twelve-month period is a rate of more than one death per month at a single facility currently housing, and until recently housing, pretrial detainees whose custody was premised on nothing more than a January 6 charge.

27. Upon issuance of pardons for January 6 defendants and the dismissal of ongoing prosecutions, every federal Bureau of Prisons facility in the country released the affected individuals immediately upon order. The D.C. Jail did not. January 6 detainees held at the D.C.

Jail were not released for several days after the pardons issued, notwithstanding that every other facility in the federal system complied without delay.

## THE STANDARD FOR MANDAMUS RELIEF

28. A writ of mandamus under 28 U.S.C. § 1361 is available where (1) the petitioner has a clear right to the relief sought; (2) the respondent has a clear, non-discretionary duty to act; and (3) no other adequate remedy is available.

29. Judge Lamberth's October 13, 2021 Order created exactly such a duty. The Order directs the Clerk to transmit the contempt finding "for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case." That referral has never been discharged by the Civil Rights Division, which Respondent now leads.

30. Petitioner's members — the class of January 6 defendants for whom the Order was entered — have a clear and direct interest in the opening of the investigation the Order requires.

31. No adequate alternative remedy exists. Individual habeas and civil rights suits by former detainees address discrete injuries to discrete individuals; they cannot substitute for the systemic civil rights investigation into the D.C. Department of Corrections that this Court's Order specifically required and that only the Civil Rights Division has authority to open.

32. The matter is urgent. The D.C. Jail continues to operate today, a few miles from the Civil Rights Division's own offices, and the most recent independent audit of record found a rate of death approaching one per month.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

A. Issue a writ of mandamus directing Respondent Harmeet K. Dhillon, in her official capacity as Assistant Attorney General for the Civil Rights Division, to open a civil rights

investigation, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and Judge Lamberth's October 13, 2021 Order, into Quincy Booth, in his capacity as Director of the D.C. Department of Corrections, and the D.C. Department of Corrections, concerning the treatment of January 6 pretrial detainees at the D.C. Jail;

B. Order that such investigation be commenced on an expedited basis, in light of the ongoing operation of the facility and the documented, continuing risk to the health and lives of persons currently or recently confined there;

C. Order Respondent to report to this Court on the status and findings of that investigation at intervals the Court deems appropriate; and

D. Grant such other and further relief as the Court deems just and proper.

Dated: August 28, 2026

Respectfully submitted,

Jonathan Gross
DC Bar ID: MD0162
LAW OFFICE OF JONATHAN GROSS
2833 Smith Ave., Suite 331
Baltimore MD 21209
(443) 813-0141
jon@jonathangross.law

*Counsel for Petitioner*
*J6ers Were Tortured in the DC Gulag*